**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Acuity v. Masters Pharmaceutical, Inc.*, **Slip Opinion No. 2022-Ohio-3092.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3092

ACUITY, APPELLANT *v.* MASTERS PHARMACEUTICAL, INC., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Acuity v. Masters Pharmaceutical, Inc.*, Slip Opinion No. 2022-Ohio-3092.]**

*Insurer of distributor of pharmaceutical products, including prescription opioids, does not owe a duty to defend its insured in lawsuits brought by governmental entities seeking economic damages for losses caused by the opioid epidemic—The insurance policies cover "damages because of bodily injury," and the damages sought by the governmental entities do not fall within that coverage.*

(No. 2020-1134—Submitted September 8, 2021—Decided September 7, 2022.)

APPEAL from the Court of Appeals for Hamilton County, No. C-190176, 2020-Ohio-3440.

_____

**O'CONNOR, C.J.**

{¶ 1} In this appeal, we consider whether appellant, Acuity, an insurer, owes a duty to defend its insured, appellee, Masters Pharmaceutical, Inc. ("Masters"), in several lawsuits brought by cities and counties in West Virginia, Michigan, and Nevada ("the governments") for economic losses caused by the opioid epidemic. The dramatic increase in the acceptance and use of highly addictive prescription opioids to treat chronic pain in recent years has contributed to the hundreds of thousands of opioid-related overdoses in the United States—now commonly referred to as the opioid-overdose epidemic. Centers for Disease Control and Prevention, *Prescription Opioids*, https://www.cdc.gov/opioids /basics/prescribed.html (accessed Apr. 27, 2022) [https://perma.cc/47KE-UGY9]; Centers for Disease Control and Prevention, *Understanding the Opioid Overdose Epidemic*, https://www.cdc.gov/opioids/basics/epidemic.html (accessed Apr. 27, 2022) [https://perma.cc/Q96N-2DA2]. The underlying lawsuits represent a growing number of actions initiated by governmental entities against opioid manufacturers, distributors, and retailers for their alleged improper marketing and inappropriate distributing of prescription opioids across the country.

{¶ 2} Masters purchased several commercial general liability insurance policies from Acuity, and those policies impose on Acuity a duty to defend the insured against any suit seeking "damages because of bodily injury." The trial court concluded that Acuity does not owe Masters a duty to defend it in the underlying suits, because the governments seek damages for their own economic losses. The First District Court of Appeals disagreed, finding that some of the governments' economic losses are arguably "because of bodily injury," and reversed the trial court's judgment. Because we conclude that Acuity does not owe Masters a duty to defend, we reverse the judgment of the court of appeals and reinstate the trial court's entry of summary judgment in favor of Acuity.

**Relevant Background**

**{¶ 3}** Masters was a wholesale distributor of pharmaceutical products, and as part of its business, Masters filled and shipped orders of prescription opioids to pharmacies around the country.[1] Twenty-two cities and counties in West Virginia, Michigan, and Nevada have sued Masters,[2] as well as several pharmaceutical manufacturers, other distributors, and retailers. These underlying suits are substantially similar to each other and share common allegations and claims against Masters. The governments allege that Masters failed to monitor and report suspicious orders of prescription opioids and to implement measures to prevent the filling of improper prescriptions and that it thereby failed to maintain effective controls against the diversion of prescription opioids into the illicit market in violation of federal and state laws. The governments claim that Masters's conduct "greatly contributed to the vast increase in opioid overuse and addiction" and caused "a public-health and law-enforcement crisis" in their respective communities. Based on these allegations, the governments assert claims for public nuisance, negligence, and, in a majority of the complaints, violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, among other laws. They allege that Masters's conduct contributed to the opioid epidemic that continues to plague their communities, resulting in the governments' suffering economic losses, such as increased law-enforcement expenses, judicial expenditures, prison and public-works costs, emergency and medical-care-services costs, substance-abuse-treatment expenses, and lost economic opportunity.

**{¶ 4}** Between July 26, 2010, and July 26, 2018, Masters purchased eight commercial general liability insurance policies from Acuity (each policy coving

---

1. As of January 1, 2018, Masters is a shell company and is no longer in operation.

2. The majority of these actions have been consolidated and transferred to a federal multidistrict-litigation court in the Northern District of Ohio as part of the national prescription-opioid litigation.

one year).  The policies state that under certain circumstances, Acuity has a duty to defend Masters against lawsuits seeking "damages because of bodily injury" and a duty to indemnify Masters for damages it may be legally obligated to pay.  Acuity filed an action in the Hamilton County Court of Common Pleas for a declaratory judgment that it owed no duty to defend or indemnify Masters in the underlying suits.  Masters counterclaimed for a declaration that Acuity owed both duties.

{¶ 5} Both parties moved for summary judgment.  In support of its motion, Acuity argued that the underlying suits do not fall within the policy coverage, because the governments seek damages for their own economic injury, not for any bodily injury, and because Masters knew of the opioid epidemic prior to purchasing the policies from Acuity.  Masters countered that the policies provide coverage because the governments seek, at least in part, "damages because of bodily injury," such as medical and treatment costs they have incurred because of opioid addiction and overdoses sustained by their citizens.

{¶ 6} The trial court ultimately agreed with Acuity for two reasons.  First, it concluded that the complaints in the underlying suits do not seek "damages because of bodily injury," because the governments seek damages solely for their own economic loss, not damages for any citizen's opioid addiction.  And second, it found that Masters knew prior to the initial policy period of the alleged "bodily injury"—i.e., prescription opioid addiction—thereby precluding coverage under the policies' loss-in-progress provisions.  It accordingly granted Acuity's motion for summary judgment, denied Masters's motion for summary judgment, and declared that Acuity did not owe a duty to defend or indemnify Masters in the underlying suits.

{¶ 7} Masters appealed and argued that the trial court erred in determining that Acuity had no duty to defend it in the underlying suits. The First District agreed and reversed the trial court's judgment.  It concluded that the policies expressly provide for organizations, like the governments in the underlying suits, to claim

"economic damages, as long as the damages occurred because of bodily injury." 2020-Ohio-3440, ¶ 17. Accordingly, it determined that the policies covered some of the governments' alleged economic losses, such as medical expenses and treatment costs, because those losses are arguably "because of bodily injury"—i.e., because of physical harm from opioid addiction. *Id*. at ¶ 30. The First District further concluded that the policies' loss-in-progress provisions did not preclude coverage, because it was unclear whether some of the governments' damages were known to Masters prior to the initial policy period. *Id*. at ¶ 50. It therefore held that Acuity has a duty to defend Masters in the underlying suits, and it remanded the case for the trial court to grant summary judgment in favor of Masters. *Id*. at ¶ 54.

**{¶ 8}** We accepted Acuity's discretionary appeal, which presents two propositions of law. *See* 160 Ohio St.3d 1495, 2020-Ohio-5634, 159 N.E.3d 277. In its first proposition of law, Acuity argues that commercial general liability policies, such as those at issue here, cover an insured's liability for an occurrence causing "bodily injury" to a specific, identifiable person and do not cover an insured's liability for corporate conduct that allegedly caused governmental entities to sustain economic losses for increased governmental services. In its second proposition, Acuity asserts that whether the loss-in-progress provision within the policies bars coverage turns on whether prior to the policy period the insured knew that the "bodily injury" had occurred, in whole or in part, and not on whether the insured knew of the damages claimed in the underlying suits. Because we resolve this case on the first proposition of law, we need not consider Acuity's second proposition.

## Analysis

### *The commercial general liability policies*

{¶ 9} Between 2010 and 2018, Acuity issued eight commercial general liability policies to Masters, all of which include the following language regarding coverage for bodily injury:

(a) [Acuity] will pay those sums that [Masters] becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. [Acuity] will have the right and duty to defend [Masters] against any suit seeking those damages. However, [Acuity] will have no duty to defend [Masters] against any suit seeking damages for bodily injury or property damage to which this insurance does not apply.

* * *

(b) This insurance applies to bodily injury and property damage only if:

(1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory;

(2) The bodily injury or property damage occurs during the policy period; and

(3) Prior to the policy period, no insured * * * knew that the bodily injury or property damage had occurred, in whole or in part. If [an] insured * * * knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

The above language is set forth under Section I, Coverage A(1) of the basic insuring agreement in each policy. "Coverage A" in standard commercial general liability policies provides for bodily-injury and property-damage liability coverage. *See* 20-129 Appleman, *Insurance Law and Practice*, Section 129.2 (2d Ed.2011).

{¶ 10} The policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The policies do not define "damages," but they do state that "damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury." Coverage A (1)(b)(3) of the policies is often referred to as the "loss-in-progress" or "known-loss" provision. *See, e.g., Ohio Cas. Ins. Co. v. Mansfield Plumbing Prods., L.L.C.*, 5th Dist. Ashland No. 2011-COA-009, 2011-Ohio-4523, ¶ 10; *Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 999 (9th Cir.2015).

### *Applicable law*

{¶ 11} We review de novo a decision granting summary judgment based on the interpretation of an insurance contract. *Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, 948 N.E.2d 931, ¶ 12 (plurality opinion), citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995). An insurance policy is a contract whose interpretation is a matter of law, *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus, and like any other contract, its terms are to be given their plain and ordinary meaning, *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 167-168, 436 N.E.2d 1347 (1982). Courts must examine an insurance contract as a whole and presume that the language used in the policy reflects the intent of the parties. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. Consequently, courts cannot read insurance policies in an overly circumscribed fashion. *Sauer v. Crews*, 140 Ohio St.3d 314, 2014-Ohio-3655, 18 N.E.3d 410, ¶ 13, citing *Gomolka* at 172.

**{¶ 12}** An insurer's duty to defend is both broader than and distinct from its duty to indemnify. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 19, citing *Socony-Vacuum Oil Co. v. Continental Cas. Co.*, 144 Ohio St. 382, 59 N.E.2d 199 (1945), paragraph one of the syllabus. When determining whether an insurer has a duty to defend, we look to the scope of the allegations of the underlying complaint filed against the insured. *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973), paragraph two of the syllabus. "If the allegations state a claim that potentially or arguably falls within the liability insurance coverage, then the insurer must defend the insured in the action." *Ward v. United Foundries, Inc.*, 129 Ohio St.3d 292, 2011-Ohio-3176, 951 N.E.2d 770, ¶ 19. But an insurer need not defend an action when all the claims are clearly and indisputably outside the policy coverage. *Preferred Risk Ins. Co. v. Gill*, 30 Ohio St.3d 108, 113, 507 N.E.2d 1118 (1987).

**{¶ 13}** There is a growing and diverging body of case law on the issue before us: whether an insurance policy that provides coverage for "damages because of bodily injury" covers claims brought by governmental entities to recover economic costs they incurred as a result of the opioid epidemic. Some courts have interpreted policy language that is nearly identical to the language at issue in the policies here and have held that similar opioid-related lawsuits filed by governmental entities invoked the insurer's duty to defend because those entities sought "damages because of bodily injury." *See, e.g.*, *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 775 (7th Cir.2016); *Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F.Supp.3d 147 (W.D.Pa.2020) (concluding that the insurance company had a duty to defend the insured distributor because the counties' underlying lawsuits alleged bodily injuries such as opioid abuse, addiction, overdose, and death suffered by their citizens and sought to recover costs related to emergency medical treatment, detoxification and addiction services, and recovery treatment).

**{¶ 14}** But other courts have concluded that no duty to defend existed in such lawsuits because the governments sought to recover their own increased economic costs resulting from a public-health crisis and did not tie their claims to an individual opioid-related injury, which would require proof of that injury. *See, e.g.*, *ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239, 253-254 (Del.2022); *Westfield Natl. Ins. Co. v. Quest Pharmaceuticals, Inc.*, W.D.Ky. No. 5:19-cv-00083-TBR, 2021 WL 1821702, *7 (May 6, 2021) (holding that because the governmental entities in the underlying suits did "not need to provide proof that [their] citizens or patients experienced any bodily injury," they did not seek damages because of bodily injury).

**{¶ 15}** Like the appellate court in its decision below, Masters heavily relies on the decision of the United States Court of Appeals for the Seventh Circuit in *H.D. Smith*. In that case, the Seventh Circuit interpreted a liability policy that, similar to the one before us, required the insurer to defend the insured against suits that seek damages "because of bodily injury." *Id.* at 773. The state of West Virginia sued the insured pharmaceutical distributor for its role in the opioid epidemic and alleged that it had incurred " 'excessive costs related to diagnosis, treatment and cure of addiction' " and had provided " 'necessary medical care, facilities, and services for treatment of citizens' who [could not] afford their own care." *Id*. at 775. The Seventh Circuit concluded that the insurer had a duty to defend the pharmaceutical distributor in the underlying litigation because West Virginia alleged that its citizens had suffered opioid-related bodily injuries and the state sought to recover as damages the money it had spent caring for those injuries. *Id*. at 774. In so holding, the court used an analogy involving a hypothetical West Virginian who suffered bodily injury because of his opioid addiction. The hypothetical man's mother spent her own money to care for her injured son and brought a suit against the pharmaceutical distributor seeking recovery of those costs. The court noted that the insurer conceded that its policy would cover the

mother's negligence claim in that situation, and the court reasoned that a state's seeking damages related to medical care and services it provided for its own citizens is no different than a mother's seeking damages for her own losses she sustained in caring for her son. *Id*.

{¶ 16} In *ACE Am. Ins. Co.*, the Delaware Supreme Court rejected this analogy. In that case, the Delaware Supreme Court held that the insurer owed no duty to defend the insured drugstore company against lawsuits filed by Ohio counties seeking "economic damages" for losses incurred as a "direct and proximate result" of the company's failure to effectively prevent the diversion of prescription opioids into the illicit market. 270 A.3d at 241, 246. The liability policy imposed a duty to defend against lawsuits seeking damages because of "personal injury," which was defined in part as "bodily injury." *Id*. at 243. The court acknowledged that the underlying parties brought direct claims asserting their own losses in both the Seventh Circuit's hypothetical case and in its case. *Id*. at 253. However, it determined that the cases differ because the hypothetical mother's claim would require proof that the alleged harm caused by the insured was the immediate and direct result of her son's injury, whereas the counties' "alleged damages do not depend on proof of bodily injuries." *Id*. at 253-254.

{¶ 17} The Delaware court reasoned that the policy required "more than some linkage between the personal injury and damages to recover 'because of' personal injury"—namely, that the underlying claims stem from a bodily injury and the damages sought be tied to that specific bodily injury. *Id*. at 250. Based on the nature of the allegations in the underlying complaints, the court determined that the counties' claims were not tied to an individual injury but to a public-health crisis, because the counties sought damages for increased economic costs caused by the opioid epidemic. *Id*. at 253. It therefore concluded that the counties' suits did not invoke the insurer's duty to defend as the suits did not seek damages because of personal injury. *Id*. at 253-254.

*The underlying complaints filed against Masters*

{¶ 18} With the above in mind, we begin with a review of the underlying complaints and the scope of the allegations against Masters. As noted above, the underlying complaints filed by the various West Virginia, Michigan, and Nevada governmental entities are substantially similar and often use comparable, if not identical, language. Because the allegations in the complaint filed by Genesee County, Michigan, against Masters mirror several of the important and relevant allegations set forth in the other underlying complaints, we use it as a representative.

{¶ 19} Genesee County seeks damages for losses it suffered due to Masters's failure "to effectively monitor and report suspicious orders of prescription opioids" and "to implement measures to prevent the filling of improper prescriptions." It claims that Masters's conduct "greatly contributed to the vast increase in opioid overuse and addiction" and "directly caused a public-health and law-enforcement crisis," thereby forcing Genesee County "to shoulder tremendous costs" and "an exorbitant financial burden." Accordingly, it seeks "damages [for losses] caused by the opioid epidemic," including "increased emergency response costs," "law enforcement and incarceration costs," "addiction treatment costs," and "medical costs," as well as "accelerated economic blight," which it claims has resulted in "diminished property values and a loss in tax revenue."

{¶ 20} Acuity argues that the underlying complaints demonstrate that the governments seek reimbursement for costs for increased governmental services provided to the public on account of the opioid epidemic, not for bodily injury experienced by any specific person or persons. It emphasizes that any claim for damages on account of an injury sustained by society as a whole or by unidentified members of the public is insufficient to constitute a claim for "damages because of bodily injury." Accordingly, Acuity maintains that to be covered, a claim must seek damages either directly or derivatively for a bodily injury sustained by a

person—neither of which, it contends, the governments claim in their underlying complaints. Stated differently, because the governments' claims for increased public-service costs are untethered to any one person's bodily injury—but, rather, to the costs of the opioid epidemic generally—Acuity asserts that the underlying suits do not seek "damages because of bodily injury." It therefore asserts that the First District incorrectly interpreted the phrase "damages because of bodily injury" so broadly as to cover "any liability where bodily injury is a tangential factor."

{¶ 21} Masters counters that the governments' complaints do include allegations regarding specific and identifiable persons who have experienced opioid-related bodily injuries. It emphasizes that Pocahontas County, West Virginia, alleges that it "experienced 34 drug overdose deaths per 100,000 population"; Saginaw County, Michigan, pleads that "116 opioid related hospitalizations" occurred in that county in 2013; and the city of Lansing, Michigan, claims that in 2015, its fire department administered 243 doses of Naloxone, a lifesaving, opioid-overdose-reversal drug. Masters stresses that every dose of Naloxone was administered to a specific person and that every hospital and treatment-program admission was of a specific person, and it asserts that it is for these specific costs as to these specific persons that the governments pray for reimbursement in their complaints. Masters therefore maintains that the losses for which the governments seek damages include the costs of medical care and other treatment they provided to their citizens suffering from opioid-related injury, illness, and death. Based on these allegations, Masters asserts that the underlying suits fall within the definition of "damages because of bodily injury" set forth in the policies, which explicitly includes "damages claimed by any * * * organization for care, loss of services or death resulting * * * from the bodily injury."

{¶ 22} It is true that some of the complaints include allegations that the governments' citizens sustained opioid-related injuries and that the damages sought by the governments include costs for providing medical care and treatment services.

But the governments' theories of relief in the underlying suits are *not* that specific opioid-related injuries sustained by their citizens occurred because of Masters's alleged failure to prevent the improper diversion of prescription opioids and that the damages sought flow from the care of those specific opioid-related injuries. For instance, Lansing, Michigan, does not claim that Masters's allegedly negligent conduct proximately caused 243 Lansing citizens' overdoses in 2015, which required the fire department to administer 243 doses of Naloxone, and Saginaw County does not claim that the conduct proximately caused 116 Saginaw County citizens' hospitalizations in 2013. Nor do the counties seek recovery for the medical care provided for *those* specific opioid-related injuries.

{¶ 23} Rather, the governments' theories of relief are that Masters's alleged failure to prevent the improper diversion of prescription opioids was a "direct and proximate cause of the opioid epidemic" and the "economic damages" sought are based on that public-health crisis. Stated differently, the governments seek damages for their own aggregate economic injuries caused by the opioid epidemic and *not* for any particular opioid-related bodily injury sustained by a citizen as a direct result of Masters's alleged failures. The governments repeatedly allege in their complaints that Masters has "created a serious public health crisis," which is a public nuisance, and that they bring the underlying actions to force Masters to "take responsibility for the opioid epidemic that [it has] created." They also allege that the "opioid epidemic has caused [the governments] to suffer past, present, and future damages in the form of the increased expenses of providing public services that so far exceeds the normal, expected costs."

{¶ 24} The allegations in the governments' complaints regarding the opioid-related overdoses, addiction, and injuries sustained by their citizens accordingly provide context for their public-nuisance, negligence, and RICO claims. *See Cincinnati Ins. Co. v. Richie Ents., L.L.C.*, W.D.Ky. No. 1:12-CV-00186-JHM-HBB, 2014 WL 3513211, *5 (July 16, 2014) (reasoning that the

underlying claims that "persons suffered physical harm and death due to prescription drugs only explains and supports the claims of the actual harm complained of: the economic loss to the State of West Virginia"); *Quest Pharmaceuticals*, 2021 WL 1821702, at *7, quoting *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 695 (7th Cir.2009) (explaining that the allegations as to opioid-related injuries to citizens "merely 'put a human touch' on the claims"). By highlighting the sheer number of opioid-related overdoses and hospitalizations that have occurred in their communities, the governments bolster their claims that Masters's alleged failure to prevent the improper diversion of prescription opioids to the public has indeed created and perpetuated a public-health crisis in their respective jurisdictions and that the governments have in fact incurred "an exorbitant financial burden" in combatting that crisis. To be sure, the opioid epidemic, as a public-health crisis, necessarily relates to bodily injuries, such as opioid addictions, hospitalizations, and deaths. But allegations of bodily injury alone do not automatically bring an action within the coverage for "damages because of bodily injury." *See Barron v. NCMIC Ins. Co.*, D.Mass. No. 17-cv-11969-ADB, 2018 WL 2089357, *6 (May 4, 2018) (concluding that the insurer had no duty to defend its insureds [chiropractors], because, even assuming that the chiropractors' patients had in fact been injured, the allegations did not "conceivably allow [the underlying plaintiff— the patients' insurer, who had paid the chiropractors' allegedly fraudulent medical bills] to in any way recover for such an injury").

{¶ 25} In sum, the governments tie their alleged losses to the aggregate economic injuries they have experienced as a result of the opioid epidemic, not to any particular bodily injury. With this in mind, we now consider whether, based on the plain language of the policies, the underlying suits seek "damages because of bodily injury," thereby invoking a duty to defend.

***The plain language of the policies requires more than a tenuous connection between the damages sought and the bodily injury***

{¶ 26} Central to the question before us is how to interpret the phrase "damages because of bodily injury" as used in the commercial general liability policies at issue here. Acuity, on the one hand, maintains that this phrase *cannot* be read broadly to include damages for increased economic costs that are untethered to any person's bodily injury. Masters, on the other hand, asserts that "because of" requires "only a causal connection between the bodily injury and the alleged damages" and that the underlying suits therefore fall within coverage since the governments seek damages because of the bodily injuries allegedly caused by opioids and sustained by their citizens.

{¶ 27} Masters's argument relies on the following premise: Acuity has a duty to defend because the governments allege that they have suffered economic loss caused by the opioid epidemic, which in turn was caused by the numerous opioid-related injuries sustained by their citizens. By this, Masters asks us to interpret "damages because of bodily injury" so expansively as to include any suit in which the damages sought merely relate to bodily injury, regardless of whether the claims are in fact tied to any particular bodily injury sustained by a person. For the reasons set forth below, we decline to adopt such an expansive interpretation.

{¶ 28} The ordinary meaning of "because of" is "by reason of" or "on account of." *Webster's Third New International Dictionary* 194 (2002). Some courts have interpreted the phrase "because of bodily injury" broadly, and Masters relies on many of these cases. *See, e.g.*, *H.D. Smith*, 829 F.3d at 774; *Natl. Assn. for the Advancement of Colored People v. Acusport Corp.*, 253 F.Supp.2d 459, 463 (E.D.N.Y.2003) (concluding that a duty to defend existed when the underlying complaint filed against the insured, a wholesale distributor of firearms, sought "damages because of bodily injury," including costs to establish firearm-related educational programs and to inspect gun dealers, because "there [was] a connection,

however remote, between injuries to persons and liability for that injury of the insured"); *Beretta U.S.A., Corp. v. Fed. Ins. Co.*, 117 F.Supp.2d 489, 496 (D.Md.2000). We find these cases unpersuasive, however.

{¶ 29} First, several of these cases do not apply Ohio law. *See*, *e.g.*, *H.D. Smith* at 773 (applying Illinois law); *Acusport Corp.* at 463 (applying either Illinois or New York law [explaining that the result would be the same under either]); *Beretta* at 493 (applying Maryland law). And in fact, we cannot find a case in which Ohio courts have made the distinction that some courts in other states have between the phrases "because of bodily injury" and "for bodily injury" for purposes of commercial general liability policies, *see, e.g.*, *H.D. Smith* at 774 (holding that the phrase "*because of* bodily injury" provides "broader coverage than [a liability policy] that covers only damages '*for* bodily injury' " [emphasis sic]). Nor would such a distinction be relevant here, because the policies use the phrase "because of bodily injury" interchangeably with "for bodily injury" in Coverage A(1)(a) of the basic insuring agreement: "We will pay those sums that the insured becomes legally obligated to pay as damages *because of* bodily injury * * *. We will have the right and duty to defend the insured against any suit seeking *those damages*. However, we will have no duty to defend the insured against any suit seeking damages *for* bodily injury * * * to which this insurance does not apply." (Emphasis added.)

{¶ 30} Further, reading the insurance policy as a whole, as we must, *see Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶ 11, the plain language of the policy does not support such a broad interpretation of "damages because of bodily injury." Coverage A(1)(a) outlines the obligation to pay and the duty to defend. It further states, in Coverage A(1)(b), that the insurance applies to bodily injury only if (1) *the bodily injury* is caused by an occurrence in the coverage territory, (2) *the bodily injury* occurs during the policy period, and (3) prior to the policy period, no insured knew that *the bodily injury* had occurred, in whole or in part. The third prong is the loss-in-progress provision, and it explains that if the

insured knew prior to the policy period that *the bodily injury* had occurred, then "any continuation, change or resumption" of such bodily injury during or after the policy period will be considered to have been known prior to the policy period.

{¶ 31} The repeated use of the phrase "*the* bodily injury" suggests that the damages sought in the underlying suit need to be tied to a particular bodily injury sustained by a person or persons in order to invoke coverage under the policies. If the phrase were interpreted as broadly as Masters argues it should be, it would be rather difficult to determine whether *the* bodily injury occurred during the policy period, was caused by an occurrence in the coverage territory, or had occurred in whole or in part prior to the policy period.

{¶ 32} The view that the damages in the underlying suit need to be tied to a particular bodily injury to invoke coverage is consistent with how courts have interpreted the loss-in-progress provision. Generally, courts have viewed the loss-in-progress provision narrowly based on its "continuing" language: if the insured knew prior to the policy period that the bodily injury or property damage occurred, "then *any continuation, change or resumption* of such bodily injury or property damage during or after the policy period" will be considered to have been known by the insured prior to the policy period. (Emphasis added.) *See, e.g.*, *Kaady*, 790 F.3d at 999; *Quanta Indemn. Co. v. Davis Homes, L.L.C.*, 606 F.Supp.2d 941, 948-949 (S.D.Ind.2009). In *Kaady*, the United States Court of Appeals for the Ninth Circuit interpreted a loss-in-progress provision like the one here, but the underlying suit involved property damage. That court noted that this provision precludes coverage if the insured "knew that *the* * * * 'property damage' had occurred, in whole or in part." (Emphasis and ellipsis sic.) *Id*. at 998. It explained that the use of the article "the" particularizes the subject that it precedes—i.e., property damage—and thus indicates that for the provision to preclude coverage, the claimed property damage in the underlying suit must be the same as the property damage known to the insured prior to the policy period. *Id*. Consequently, "an insured's

knowledge of one type of damage to property doesn't automatically constitute knowledge of any and all damage to the property." *Id*. at 998-999. Any other interpretation, it reasoned, would eviscerate the provision's "continuing" language: "[I]f the insured's knowledge of any damage to any part of the structure automatically barred coverage of all damage to that structure, it wouldn't matter whether the claimed damage was a 'continuation, change or resumption' of the known damage." *Id*. at 999. The loss-in-progress provision therefore must be interpreted as precluding coverage if the claimed damage in the underlying suit is a "continuation, change or resumption" of that same damage known to the insured prior to the policy period. *Id*.

**{¶ 33}** We ultimately decline to reach the loss-in-progress provision's application to the case here based on our resolution of Acuity's first proposition. Nevertheless, this narrow interpretation of the loss-in-progress provision helps focus the lens by which to review the phrase "damages because of bodily injury." Determining the loss-in-progress provision's application necessarily requires examining whether the specific type of bodily injury alleged in the underlying suit was a continuation, change, or resumption of that same type of bodily injury allegedly known by the insured prior to the policy period. *See Quanta Indemn. Co.* at 948-949 (holding that the known-loss provision precluded coverage because the insured knew of the brain-stem injury prior to the policy's inception and the bodily injury alleged in the underlying suit was that exact same brain-stem injury [which allegedly resulted in death during the policy period]). The bodily injury alleged in the underlying suit therefore must be a particularized injury in order to make the comparison necessary under the loss-in-progress provision.

**{¶ 34}** To determine otherwise would be to conclude that "bodily injury" should be interpreted broadly in one part of the policy, i.e., Coverage A(1)(a), but narrowly in the following part, i.e., Coverage A(1)(b). Applying such a broad interpretation in Coverage A(1)(a) would also beg the question: Why would the

policy restrict coverage to bodily injury caused by an occurrence that takes place in the coverage territory, occurs during the policy period, and is not known to the insured prior to the policy period if the damages sought need not be tied to any particular bodily injury sustained by a person? Moreover, applying a broad interpretation of "bodily injury" in Coverage A(1)(a) of the policy would severely dilute the application of Coverage A(1)(b), and it would seemingly contradict precedent from this court, *see Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, ¶ 36 (explaining that the underlying suit fell outside the scope of coverage because the claimed negligent nondisclosure of the structural damage was not an "occurrence," i.e., an accident, that resulted in the property damage, but instead "an accident that allegedly caused economic damages").

{¶ 35} "The concept of 'bodily injury' is obviously central to the meaning of Coverage A." 20-129 Appleman, Section 129.2; *see also Barron*, 2018 WL 2089357, at *6 (interpreting a similar liability policy and describing an "injury" as being "the crucial requirement for a claim to be covered under [the policy]"). The significance of the term "bodily injury" to the meaning of the insuring agreement undermines Masters's expansive view of the phrase "damages because of bodily injury." *See Wohl v. Swinney*, 118 Ohio St.3d 277, 2008-Ohio-2334, 888 N.E.2d 1062, ¶ 22 (rejecting the appellees' interpretation of the insurance policy because it "would render meaningless portions of the contract"). Moreover, if the intent behind the liability policy had been to afford such broad coverage—with "damages because of bodily injury" encompassing any suit seeking losses that tangentially relate to a bodily injury sustained by a person—different language would have been used to make that intent clear. *See Stickovich v. Cleveland*, 143 Ohio App.3d 13, 37, 757 N.E.2d 50 (8th Dist.2001) ("The term 'arising out of' in a liability insurance policy affords very broad coverage. This court has held that 'arising out of' means 'flowing from' or 'having its origin in' "); *Beaver Excavating Co. v. Testa*, 134

Ohio St.3d 565, 2012-Ohio-5776, 983 N.E.2d 1317, ¶ 31 ("the phrase 'relating to' is plainly intended to be interpreted broadly").

{¶ 36} We therefore conclude that the phrase "damages because of bodily injury" in the policies before us requires more than a tenuous connection between the alleged bodily injury sustained by a person and the damages sought. *See ACE Am. Ins. Co.*, 270 A.3d at 250; *Diamond State Ins. Co. v. Chester-Jensen Co., Inc.*, 243 Ill.App.3d 471, 477, 611 N.E.2d 1083 (1993) (rejecting an insured's assertion that its liability for the state's economic losses due to state employees' illness was covered by its insurance policy, because such an interpretation would "extend [the policy's] reach so as to provide coverage for any liability where bodily injury is a tangential factor"). A sufficient connection will likely be found to exist under standard commercial general liability polices when the damages sought in the underlying suit are for losses asserted by (1) the person injured, *see, e.g.*, *Fairless v. Acuity*, 1st Dist. Hamilton No. C-210165, 2022-Ohio-10 (holding that insurer had a duty to defend insured property-management company and property manager because complaint alleged that plaintiff sustained injuries on insureds' negligently maintained premises), (2) a person recovering on behalf of the injured person, *see, e.g.*, *United States Liab. Ins. Co. v. Jenkins*, M.D.Ga. No. 7:13-CV-164, 2015 WL 3756046 (June 16, 2015) (holding that insurer had a duty to defend its insured, a day-care center, in lawsuit brought by parents seeking damages for injuries sustained by their minor daughter while under the day-care center's supervision), or (3) a person or organization that directly suffered harm because of another person's injury—in which case, the existence and cause of the injury must be proved, *see, e.g.*, *Cincinnati Ins. Co. v. Robert W. Setterlin & Sons*, 10th Dist. Franklin No. 07AP-47, 2007-Ohio-5094 (holding that insurer had a duty to defend its insured, a general contractor, against a lawsuit brought by one of its subcontractors seeking damages for increased workers' compensation premiums on

account of a bodily injury the general contractor's negligence caused one of the subcontractor's employees).

### *The underlying suits do not seek "damages because of bodily injury"*

**{¶ 37}** Obviously, the governments' claims in the underlying suits do not seek damages for bodily injury sustained by themselves.  Nor do they seek damages for bodily injury on behalf of their injured citizens.  In fact, the majority of the governments disclaim such injuries: "The damages Plaintiff has suffered are not derivative of third party's injury or injuries"; "[n]or are [the plaintiff's] damages derivative of harm visited upon third party persons or entities not named in this action."

**{¶ 38}** Further, the governments here do not seek damages because of any particular opioid-related injury sustained by a citizen.  Like the Delaware Supreme Court in *ACE Am. Ins. Co.*, we find the Seventh Circuit's hypothetical described above unhelpful and not comparable to the underlying suits here.  The mother in that hypothetical must demonstrate that her son was indeed injured by the insured pharmaceutical distributor's allegedly negligent distribution of the product and that the financial harm to her (the money she spent caring for her son) was because of that injury.  *See, e.g.*, *Roberts v. Luneau-Gordon*, 2d Dist. Montgomery No. 15212, 1995 WL 703898, *5-6 (Nov. 29, 1995) (wherein the parents' claims for medical expenses, loss of consortium, and negligent infliction of emotional distress failed because the parents could not prove that the doctor's conduct proximately caused the injury to their child); *Rouse v. Riverside Methodist Hosp.*, 9 Ohio App.3d 206, 212, 459 N.E.2d 593 (10th Dist.1983) (explaining that a parent may "recover from the wrongdoer the reasonable value of the care or attendance which he himself renders to his child as the result of a negligent injury").  In other words, the hypothetical mother's claim is tied to a particular bodily injury and depends on proof of bodily injury to her son. *ACE Am. Ins. Co.* at 253; *Quest Pharmaceuticals*, 2021 WL 1821702, at *7; *see also Simmons v. Hertzman*, 99 Ohio App.3d 453,

459, 651 N.E.2d 13 (1st Dist.1994) (explaining that parents' direct claim for medical expenses to care for their injured daughter failed because they did not allege that the injury was proximately caused by the allegedly negligent procedure). Consequently, the hypothetical falls within the third category of sufficient connection noted above; the mother is a claimant who suffered her own losses (i.e., medical expenses) because of another's bodily injury (her son's opioid addiction) and who must demonstrate the existence and cause of that injury to recover her losses.

{¶ 39} Unlike the hypothetical mother, however, the governments in the underlying suits do not tie their alleged economic losses to particular bodily injuries sustained by their citizens but to the aggregate economic injuries they have experienced because of the opioid epidemic. We therefore conclude that based on the scope of the governments' allegations and the plain language of the policies, the underlying suits do not seek "damages because of bodily injury" and Acuity does not have a duty to defend Masters in the underlying suits. To hold otherwise would be to conclude that a duty to defend exists simply because a consequence of the alleged public-health crisis is bodily injury, regardless of the fact that the underlying parties do not seek damages because of any particular bodily injury sustained by a person. We find this to be an extraordinarily expansive view and one that gives us much pause given the potential floodgates it might open.

## Conclusion

{¶ 40} Based on the scope of the allegations in the underlying complaints, we conclude that the governments do not seek "damages because of bodily injury." Accordingly, we hold that Acuity does not owe Masters a duty to defend it in the underlying suits. We reverse the judgment of the First District Court of Appeals holding otherwise, and we reinstate the trial court's decision granting summary judgment in favor of Acuity in its declaratory-judgment action.

Judgment reversed

and trial court's judgment reinstated.

KENNEDY, FISCHER, DEWINE, and DONNELLY, JJ., concur.

STEWART, J., dissents, with an opinion joined by BRUNNER, J.

_____

**STEWART, J., dissenting.**

{¶ 41} This case involves the interpretation of insurance policies, and as with any contract, insurance policies must be interpreted as written, *Lubrizol Advanced Materials, Inc. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA.*, 161 Ohio St.3d 1, 2020-Ohio-1579, 160 N.E.3d 701, ¶ 13. Under the plain language of the commercial general liability policies at issue in this case, defendant-appellant, Acuity, promised to defend its insured, plaintiff-appellee, Masters Pharmaceutical, Inc. ("Masters"), against suits seeking "damages because of bodily injury." Because Acuity's duty to defend Masters was triggered when cities and counties in West Virginia, Michigan, and Nevada filed lawsuits seeking damages that included costs for treatment and services for citizens of the government-plaintiffs in the underlying cases suffering from opioid-related addiction or disease, I would affirm the decision of the First District Court of Appeals.

{¶ 42} This court made clear, decades ago, that "where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage ha[s] been pleaded, the insurer must accept the defense of the claim." *Willoughby Hills v. Cincinnati Ins. Co*., 9 Ohio St.3d 177, 180, 459 N.E.2d 555 (1984). Moreover, "where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *Lane v. Grange Mut. Cos.*, 45 Ohio St.3d 63, 65, 543 N.E.2d 488 (1989).

**{¶ 43}** In its complaint for declaratory judgment and its motion for summary judgment, Acuity argued that it had no duty to defend Masters, because the governmental entities did not allege that they had sustained bodily injury. The trial court agreed, granting Acuity's motion for summary judgment and overruling Masters's motion for summary judgment and issuing a declaratory judgment that Acuity does not owe Masters a defense for the underlying claims. The court reasoned that Acuity does not have a duty to defend Masters in the underlying litigation, because the governmental entities are not seeking damages on behalf of their citizens who sustained losses because of bodily injury but instead are seeking damages solely for their own economic losses. The court also held that Masters knew of prescription-opioid addiction before Acuity insured Masters, precluding any coverage under the loss-in-progress provision of the policies, which specifies that "[i]f [an] insured * * * knew, prior to the policy period, that the bodily injury * * * occurred, then any continuation, change or resumption of such bodily injury * * * during or after the policy period will be deemed to have been known prior to the policy period." Section I, Coverage A(1)(b)(3).

**{¶ 44}** In reversing summary judgment in favor of Acuity and remanding the case to the trial court with instructions to grant summary judgment in favor of Masters, a unanimous court of appeals held that the governmental entities were indeed seeking their own economic losses but that some of those losses were arguably because of bodily injury, triggering the duty to defend. It also held that coverage was not barred under the loss-in-progress provision, because Masters's mere knowledge of the risk that the diversion of its products could contribute to the opioid epidemic, resulting in costs to the governmental entities, was not enough to bar coverage.

**{¶ 45}** The commercial general liability policies that Acuity issued to Masters for the policy periods of July 26, 2010, to July 26, 2018, included the following language:

(a) [Acuity] will pay those sums that [Masters] becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. [Acuity] will have the right and duty to defend [Masters] against any suit seeking those damages. However, [Acuity] will have no duty to defend [Masters] against any suit seeking damages for bodily injury or property damage to which this insurance does not apply.

* * *

(b) This insurance applies to bodily injury and property damage only if:

(1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory;

(2) The bodily injury or property damage occurs during the policy period; and

(3) Prior to the policy period, no insured * * * knew that the bodily injury or property damage had occurred, in whole or in part. If [an] insured * * * knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

Section I, Coverage A(1). The policies explain that "[d]amages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury." And "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

{¶ 46} In reversing the court of appeals' judgment and reinstating the trial court's summary judgment in favor of Acuity, the majority opinion concludes that, based on the allegations in the underlying complaints, the governmental entities do not seek "damages because of bodily injury" but instead seek damages for their own economic losses. However, the policies potentially cover the losses alleged in the underlying suits, as medical expenses and treatment costs are arguably "because of" bodily injury. In holding that Acuity has no duty to defend Masters in the underlying lawsuits, the majority opinion ignores blackletter law and the plain language of the policies. Because we must construe the policies strictly against Acuity, the court of appeals was correct to reverse the summary judgment.

{¶ 47} The underlying lawsuits allege that Masters acted negligently in failing to investigate, report, and refuse to fill suspicious orders of prescription opioids and failing to maintain effective controls against the diversion of prescription opioids, which contributed to the opioid epidemic and resulted in increased costs to the governmental entities. More specifically, the governmental entities seek damages for the significant amount of money spent on their citizens for emergency medical treatment, ambulatory services, detoxification and addiction treatment, and inpatient hospital services, among other things.

{¶ 48} The majority opinion disregards the plain language of the policies and finds that the phrase "damages because of bodily injury" does not actually mean what it says, concluding that the policies require "more than a tenuous connection between the alleged bodily injury *sustained by a person* and the damages sought." (Emphasis added.) Majority opinion, ¶ 36. The majority asserts that if the intent behind the policies had been to afford such broad coverage that they cover "any suit seeking losses that tangentially relate to a bodily injury sustained by a person," different language would have been used. *Id.* at ¶ 35.

{¶ 49} The majority's assertion begs the question: what language would have been sufficient, when the policies expressly provide for that precise coverage

(bodily injuries on or after July 26, 2010, that occurred in the governmental entities' jurisdictions)? Nothing in the policy language requires that the claimant bringing the suit seek to recover the costs of the claimant's own bodily injury. And had Acuity wanted to exclude coverage for losses claimed by entities because of bodily injury suffered by third persons, or claims brought by governmental entities, it could have said so, but it did not. *See Am. Fin. Corp. v. Fireman's Fund. Ins. Co.*, 15 Ohio St.2d 171, 174, 239 N.E.3d 33 (1968) ("an exclusion from liability must be clear and exact in order to be given effect"). And the policies themselves cover liabilities to organizations (like governmental entities), which cannot personally suffer "bodily injuries."

**{¶ 50}** The majority focuses, however, on Section I, Coverage A(1)(b) in the policies to defend its conclusion, stating that "[t]he repeated use of the phrase '*the* bodily injury' suggests that the damages sought in the underlying suit need to be tied to a particular bodily injury sustained by a person or persons in order to invoke coverage under the policies." (Emphasis added in the majority opinion.) Majority opinion at ¶ 31. But this interpretation adds words to the policies; the language in the policies does not specify who, or whether a particular claimant, must suffer the bodily injury for coverage. And this court should not read into the contract a meaning that is not there. *See Motorists Mut. Ins. Co. v. Tomanski*, 27 Ohio St.2d 222, 226, 271 N.E.2d 924 (1971) ("This court has refused to change the meaning of language contained in an insurance contract when that wording is directly applicable to the facts under consideration, and will not read into a contract meaning which was not placed there by an act of the parties"). And if a claim is arguably within the policy coverage, an insurer must accept the defense of the claim. *Willoughby Hills*, 9 Ohio St.3d at 180, 459 N.E.2d 555.

**{¶ 51}** The majority rejects the reasoning in *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 775 (7th Cir.2016), a case in which the United States Court of Appeals for the Seventh Circuit interpreted nearly identical language in a

commercial general liability policy and held that suits seeking damages "because of bodily injury" included a suit brought by West Virginia against the insured to recover as damages the money it had spent caring for drug-addicted West Virginians who suffered opioid-related injuries and could not pay for their own care, thus triggering the insurer's duty to defend. In an attempt to distinguish that case from the one before us, the majority opinion notes that *H.D. Smith* applied Illinois law. But, as the First District correctly determined in this case, *see* 2020-Ohio-3440, ¶ 22, the judgment comports with Ohio law. *See H.D. Smith* at 773-774 (explaining that it is the court's job to compare the allegations in the complaint to the policy language to determine whether an insurer's duty to defend is triggered and noting that the allegations must be liberally construed in favor of the insured). In *H.D. Smith*, the insurer made arguments similar to Acuity's, alleging that West Virginia sought damages to recover its own losses and did not seek damages on behalf of its citizens, therefore precluding coverage. The Seventh Circuit explicitly rejected this argument stating: "[S]o what? [The insurer's] argument is untethered to any language in the policy." *Id*. at 774; s*ee also Scottsdale Ins. Co. v. Natl. Shooting Sports Found.*, 226 F.3d 642, 2000 WL 1029091 (5th Cir.2000) (holding that an insurer's duty to defend was triggered under a standard commercial general liability policy when a municipality filed a suit seeking to recoup expenses associated with the manufacture, marketing, promotion, and sale of firearms that were unreasonably dangerous, including the cost of increased police force and increased emergency care, and rejecting the insurer's argument that the provision limiting coverage to claims for damages incurred "because of bodily injury" required that the plaintiff seeking damages be the one who suffered the loss).

{¶ 52} The majority cites favorably *ACE Am. Ins. Co. v Rite Aid Corp*., 270 A.3d 239 (Del.2022), a Delaware Supreme Court case that interpreted similar policy language narrowly to hold that an insurer had no duty to defend Rite Aid against lawsuits filed by two Ohio counties seeking to recover opioid-related

economic damages.  In that case, the policy provided that the insurer had a duty to defend the insured against any suit seeking "damages because of 'personal injury' "; the policy covered damages "claimed by a person or organization for care, loss of services or death resulting at any time from the 'personal injury,' " and "personal injury" was defined to include "bodily injury."  *Id*. at 242-243.  Despite this clear language, the Delaware Supreme Court limited coverage for losses because of personal injury to three categories of claims: claims asserted by the person injured, claims asserted by a person recovering on behalf of the person injured, and claims asserted by people or organizations that treated the person injured who demonstrate the existence of and cause of the injuries.  *Id*. at 247.  The dissenting opinion, however, applied the policy language as written and pointed out that the policy does not contain language limiting coverage in the way the majority held it did: "The policy covers damages claimed by *any* organization for the care of a person injured by Rite Aid."  (Emphasis sic.)  *Id*. at 256 (Vaughn, J., dissenting).  The dissenting opinion recognized that the allegations in that case were arguably covered by the policy because the governmental entities sought damages for medical care for the injuries suffered by their citizens.

{¶ 53} Here, the majority's theory is untethered to any policy language and similarly restricts coverage for losses to three categories of claims (when no language in the policies support such a restriction): claims in which (1) the person seeking damages is the person injured, (2) the person seeking damages is recovering on behalf of the injured person, and (3) the person or organization seeking damages directly suffered harm because of another person's injury—in which case, the existence and cause of the injury must be proved, majority opinion at ¶ 36.  But by adding these words to the policies, the majority opinion is not construing the language strictly against Acuity, which it is required to do, *see Lane*, 45 Ohio St.3d at 65, 543 N.E.2d 488 ("The insurer, being the one who selects the language in the contract, must be specific in its use").

{¶ 54} Finally, the loss-in-progress provision of the policies is an exclusion that Acuity must prove applies to the facts of this case. *See Continental Ins. Co. v. Louis Marx & Co., Inc.*, 64 Ohio St.2d 399, 401, 415 N.E.2d 315 (1980), quoting *Arcos Corp. v. Am. Mut. Liab. Ins. Co.*, 350 F.Supp. 380, 384 (E.D.Pa.1972) (" 'A defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it' "). The exclusion at issue states, "This insurance applies to bodily injury and property damage only if * * * [p]rior to the policy period, no insured * * * knew that the bodily injury or property damage had occurred, in whole or in part." The First District held that the loss-in-progress provision is a prerequisite to establishing coverage, rather than an exclusion to coverage and that, therefore, Masters has the burden to show that the provision does not apply. 2020-Ohio-3440 at ¶ 38. But the loss-in-progress provision is not a prerequisite to establishing coverage. *See, e.g.*, *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F.Supp.2d 719, 734 (S.D.Ohio 2012) ("the only appropriate avenue to introduce a loss in progress issue into an insurance dispute is when the policy at issue contains a loss in progress exclusionary endorsement"). Despite its incorrectly shifting the burden to Masters, the First District was nevertheless correct when it found that Masters's mere knowledge of the risk that "prescription drugs it distributed wholesale could eventually be diverted into illegal channels far down the supply chain or be misused and abused by individuals" was not enough to bar coverage. 2020-Ohio-3440 at ¶ 44, 50.

{¶ 55} By its plain terms, the loss-in-progress provision applies only if Masters had knowledge of an actual injury it caused before the policy period, not mere knowledge of a risk of injury generally. *See Buckeye Ranch, Inc., v. Northfield Ins. Co.*, 134 Ohio Misc.2d 10, 2005-Ohio-5316, 839 N.E.2d 94, ¶ 30 (C.P.) ("Awareness by the [insured] of an act that might someday result in [injury] is not equivalent to knowledge of [injury]"). Acuity argues that mere awareness of addiction in unidentified members of the public is enough to trigger the exclusion,

but there is no evidence that prior to the time that Masters purchased the policies, it knew about the addictions, overdoses, and deaths caused by opioids that are alleged in the underlying suits. *See Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F.Supp. 576, 585 (N.D.Ohio 1993) ("If knowledge of certain risks posed by a product were sufficient to infer intent by a manufacturer to injure consumers, then no manufacturer would ever be able to seek coverage from an insurer because every product has certain known dangers and risks").

**{¶ 56}** The majority declines to decide whether the loss-in-progress provision applies in this case, but the majority nevertheless interprets the provision narrowly and determines that "[t]he bodily injury alleged in the underlying suit * * * must be a particularized injury in order to make the comparison necessary under the loss-in-progress provision." Majority opinion at ¶ 33. But the article "the" before "bodily injury" merely means that "the bodily injury" in the loss-in-progress provision is the same bodily injury referred to earlier in the policy—or more specifically to this case, any opioid-related injury on or after July 26, 2010, that occurred in the governmental entities' jurisdictions. *See Black's Law Dictionary* 1477 (6th Ed.1990) (defining "the" as "[a]n article which particularizes the subject spoken of"). Accordingly, the majority's interpretation of the policy language attempts to add ambiguity that does not exist.

**{¶ 57}** Because the plain language of the policies triggers Acuity's duty to defend in the underlying lawsuits, I would affirm the judgment of the First District Court of Appeals. Because the majority holds otherwise, I respectfully dissent.

BRUNNER, J., concurs in the foregoing opinion.

———————————

Tucker Ellis, L.L.P., and Benjamin C. Sassé; Gallagher Sharp, L.L.P., and Gary L. Nicholson; Dean & Fulkerson, P.C., and Karen Libertiny Ludden; and Hanna, Campbell & Powell, L.L.P., and John Chlysta, for appellant.

Brouse McDowell, L.P.A., Paul A. Rose, and Amanda M. Leffler, for appellee.

Reed Smith, L.L.P., and Jason E. Hazlewood, urging affirmance for amicus curiae United Policyholders.

Collins, Roche, Utley & Garner, Richard M. Garner, David L. Lester, and James S. Kresge, urging reversal for amicus curiae Ohio Insurance Institute.

Weston Hurd, L.L.P., and Gary W. Johnson, urging reversal for amici curiae Complex Insurance Claims Litigation Association, American Property Casualty Insurance Association, and National Association of Mutual Insurance Companies.

_____