[Cite as *Sliva v. Muhammad*, 2024-Ohio-4462.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Janice Ann Sliva, as Executor
of the Estate of Randell Lee Shank,                    :

                                          :

        Plaintiff-Appellant,              :              No. 23AP-343
                                          (C.P.C. No. 20CV-2795)
                                          :
v.
                                          :              (ACCELERATED CALENDAR)

Abdirizack A. Muhammad et al.,

                                          :

        Defendants-Appellees.             :

                                          :

D E C I S I O N

Rendered on September 10, 2024

**On brief:** *The Fitch Law Firm, LLC*, and *John K. Fitch*, for appellant. **Argued:** *John K. Fitch*.

**On brief:** *Pelini, Campbell & Ricard, LLC, John E. Vincent*, and *Eric M. Hopkins*, for appellee Westfield Insurance Company. **Argued:** *John E. Vincent*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Janice Ann Sliva, executor of the estate of Randell Lee Shank, appeals from a judgment of the Franklin County Court of Common Pleas granting a motion for summary judgment filed by defendant-appellee Westfield Insurance Company ("Westfield"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} This case arises from an automobile collision that occurred on February 25, 2020 near the intersection of I-270 and State Route 33 in Franklin County, Ohio. Defendant Daisha B. Shackleford was driving on the ramp to merge onto I-270 when she

lost control of her vehicle and spun out, ultimately coming to rest on the interstate facing oncoming traffic. Shank was driving on the interstate in the lane where Shackleford's vehicle came to rest and was able to stop his vehicle before striking Shackleford's vehicle. A semi-truck driven by defendant Abdirizack A. Muhammed then collided with Shank's and Shackleford's vehicles. Tragically, Shank died as a result of injuries suffered in the collision.

{¶ 3} At the time of the collision, Shank was driving a vehicle owned by his employer and covered by an insurance policy issued by Westfield (the "Westfield Policy"). The Westfield Policy included $1 million per accident in uninsured or underinsured motorist coverage. Shackleford's vehicle was covered by an insurance policy issued by Encompass, with policy limits of $25,000. Muhammed's vehicle was covered by a policy issued by Protective Insurance, with combined policy limits of $5 million.

{¶ 4} Appellant filed a lawsuit against Muhammed and Shackleford. The complaint also named as defendants Westfield, Mohamed Dure Abdullahi, who was alleged to have been the co-driver of the semi-truck, and CEVA Freight, LLC, CEVA Ground U.S., L.P., and Platinum Ground Solution, LLC, who were alleged to have owned or operated the semi-truck Muhammed drove. For purposes of this appeal, we will refer to Muhammed, Abdullahi, CEVA Freight, CEVA Ground, and Platinum Ground Solutions as "the CEVA defendants." The complaint asserted claims for wrongful death and survivorship against Shackleford and the CEVA defendants, and claims for declaratory judgment, breach of contract, and bad faith against Westfield.[1] As relevant to this appeal, the complaint alleged that Shackleford was an underinsured motorist and sought a declaration of the rights of the parties and determination of damages due to appellant under the Westfield Policy.

{¶ 5} Westfield moved for summary judgment asserting appellant could not recover on an underinsured motorist claim because the total amount of the insurance policies covering Shackleford and the CEVA defendants exceeded the $1 million underinsured motorist coverage limit provided in the Westfield Policy. Westfield further asserted it had not acted in bad faith because it had a reasonable justification for denying appellant's underinsured motorist coverage claim.

---

[1] The complaint also named the Ohio Bureau of Workers' Compensation as a defendant, asserting it may have a subrogated right to conditional reimbursement.

{¶ 6} In a Franklin County Probate Court case, appellant entered into a settlement with the CEVA defendants for $5 million. The parties filed a stipulation which stated that they "stipulate and agree that the Franklin County Probate Court, in Case No. 603569, approved the Wrongful Death Settlement of $5,000,000 between the Estate of Randell Shank and the CEVA Defendants, and that the CEVA Defendants have paid the amount due." (Nov. 21, 2022 Stip. Regarding Status of Wrongful Death Settlement, at 1.) The settlement agreement between appellant and the CEVA defendants is not part of the record in this case. In support of its opposition to summary judgment, appellant's counsel submitted an affidavit averring that "[t]here is a $5,000,000.00 settlement agreement between [appellant] and CEVA Defendants; however, notwithstanding the settlement agreement, the CEVA Defendants denied liability in this case." (Memo in Opp. to Mot. for Summ. Jgmt., Fitch Aff. Ex.1 at ¶ 3.) After entering that settlement, noting that it "[had] settled with CEVA Defendants only," appellant dismissed with prejudice the claims against the CEVA defendants in this case. (Feb. 14, 2023 Stip. of Partial Dismissal With Respect to the "CEVA Defendants" Only.)

{¶ 7} The trial court granted Westfield's motion for summary judgment, concluding that underinsured motorist coverage under the Westfield Policy was not triggered because the total liability coverage for Shackleford and the CEVA defendants exceeded the limit of the underinsured motorist coverage provided in the Westfield Policy. The trial court reasoned that Westfield would be entitled to set off the $5 million settlement appellant received from the CEVA defendants; because this exceeded the $1 million limit of underinsured motorist coverage under the Westfield Policy, appellant would not be entitled to excess recovery from Westfield. The trial court also concluded that Westfield had a reasonable justification for refusing to pay the underinsured motorist claim and had not acted in bad faith. Following the summary judgment decision, appellant, the Ohio Bureau of Workers' Compensation, and Shackleford stipulated to dismissal of the remaining claims without prejudice.

## II. Assignment of Error

{¶ 8} Appellant appeals and assigns the following sole assignment of error for our review:

The trial court erred to the prejudice of Appellant Janet Sliva in granting Appellee Westfield Insurance Company's Motion for Summary Judgment.

## III. Discussion

### A. Standard of review

{¶ 9} Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29. We review a decision granting summary judgment de novo, conducting an independent review of the record and affording no deference to the trial court's decision. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6.

### B. The parties' arguments and the trial court's decision

{¶ 10} In its motion for summary judgment, Westfield argued that pursuant to the Westfield Policy, it was "entitled to a set off from <u>all</u> tortfeasors,[2] collectively," and therefore entitled to a declaration that underinsured motorist coverage was not triggered if appellant recovered more than $1 million from all tortfeasors. (Emphasis sic.) (Westfield's Mot. for Summ. Jgmt. at 4.) In support of this argument, Westfield pointed in particular to text contained within the Ohio Uninsured and Underinsured Motorists Coverage – Bodily Injury Endorsement ("UIM Endorsement") which provides and limits the underinsured motorist coverage as follows:

> **A. Coverage**
>
> **1.** We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or operator of an "uninsured motor vehicle" or "underinsured motor vehicle" because of "bodily injury" sustained by the "insured" and caused by an "accident."
>
> * * *

---

[2] Westfield uses the term "tortfeasors" throughout its brief, and for this reason we refer to the term when summarizing Westfield's argument. The trial court also used the term. However, the Westfield Policy does not use the term "tortfeasor." Therefore, we will not endeavor to interpret this term or accord it any significance. Rather, we focus our analysis on the terms used in the policy.

### D. Limit Of Insurance[3]

* * *

> 4. With respect to coverage provided for damages resulting from an "accident" with an "underinsured motor vehicle," the limit of insurance shall be reduced by all sums paid for "bodily injury" by or on behalf of anyone who is *legally responsible*.

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1.)  Westfield cited *Heaton v. Carter*, 5th Dist. No. 05-CA-76, 2006-Ohio-633; *Blackburn v. Hamoudi*, 10th Dist. No. 89AP-1102 (Sept. 18, 1990); *Vawter v. Select Transp., Inc.*, 10th Dist. No. 99AP-191 (Dec. 2, 1999); and *Roberts v. Allstate Ins. Co.*, 12th Dist. No. CA2001-06-133 (Dec. 17, 2001), and other decisions for the proposition that, as a matter of law, similar insurance policies have been interpreted in such a way that underinsured motorist coverage is not triggered when settlement funds paid to a plaintiff by joint tortfeasors exceed the maximum underinsured motorist coverage amount set forth in a policy.  Westfield also argued that such an interpretation was consistent with R.C. 3937.18(C).  Arguing in opposition to summary judgment, appellant pointed the court to *English v. Progressive Specialty Ins. Co.*, 6th Dist. No. L-14-1239, 2016-Ohio-847; *Ruiz v. GEICO*, 10th Dist. No. 08AP-955, 2009-Ohio-2759; and *Kirby v. Barletto*, 10th Dist. No. 09AP-158, 2009-Ohio-5090.

{¶ 11} The trial court noted appellant alleged that two tortfeasors, defendant Muhammad and defendant Shackleford, each negligently operated their vehicles by driving at excessive speed, failing to control their vehicles, and failing to maintain an assured clear distance.  After analyzing the cases suggested by the parties, the trial court ultimately relied on *Heaton*, *Blackburn*, and *Vawter*, as well as several cases from other districts and concluded that *"[r]egardless of the outcome of a trial*, based on the set-off and limits of coverage language in Westfield's underinsured motorist policy and the language of O.R.C. 3937.18(C), Westfield would be entitled to set off the $5,000,000 that [appellant] already received." (Emphasis added.) (Decision & Entry at 14.)

---

[3] The UIM Endorsement also limits the underinsured motorist coverage as follows: "We will not make a duplicate payment under this Coverage Form for any element of 'loss' for which payment has been made by or for anyone who is *legally responsible*." (Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1, Section D3.)

**C. Analysis**

{¶ 12} Appellant argues the trial court erred in disregarding the outcome of a trial. Appellant posits that "[l]egal responsibility is not established just because a defendant agreed to a settlement. * * * Furthermore, a finding of negligence does not mean that such negligence was the proximate cause of an accident. * * * Legal responsibility is a question of fact to be determined by a jury. A jury must determine legal responsibility before the set-off can be calculated." (Appellant's Brief at 14.)

{¶ 13} At the heart of this case is the interpretation of the term "legally responsible" as used in the UIM Endorsement in the context of the Westfield Policy. Westfield argues that, by law, the CEVA defendants are "legally responsible" and therefore Westfield's $1 million underinsured motorist coverage is reduced by the $5 million sum the CEVA defendants paid in settlement funds to appellant. Thus, according to Westfield, appellant is not entitled to any underinsured motorist coverage and summary judgment in its favor should be affirmed. Appellant argues a jury must make a factual determination as to whether the CEVA defendants are "legally responsible." Therefore, according to appellant, because no such determination has been made the case must be remanded to the trial court for a jury trial to determine if the CEVA defendants are "legally responsible" before the court can decide whether Westfield's underinsured motorist coverage should be reduced by the $5 million sum CEVA defendants paid in settlement funds to appellant.

**1. Plain and ordinary meaning of "legally responsible"**

{¶ 14} "An insurance policy is a contract whose interpretation is a matter of law." *Acuity v. Masters Pharmaceuticals, Inc.*, 169 Ohio St.3d 387, 2022-Ohio-3092, ¶ 11. "Courts must examine an insurance contract as a whole and presume that the language used in the policy reflects the intent of the parties." *Id.* The terms of an insurance policy are to be given their plain and ordinary meaning and "courts must not read insurance policies in an overly circumscribed fashion." *Id.*

{¶ 15} The term "legally responsible" is not defined within the UIM Endorsement and not defined within the Business Auto Coverage Form which the UIM Endorsement modifies.[4] Nevertheless, "[i]n determining the plain and ordinary meaning of a word,

---

[4] The UIM Endorsement provides that it modifies the Westfield Policy as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

courts may look to dictionary definitions of the word." *State v. Bertram*, 173 Ohio St.3d 186, 2023-Ohio-1456, ¶ 13.[5]

{¶ 16} *Black's Law Dictionary* defines the word "legally" as "[i]n a lawful way; in a manner that accords with the law" or "[a]ccording to the law." *Black's Law Dictionary* 1032 (10th Ed.2014). As applicable here, *Black's* defines "responsibility" as "[t]he quality, state, or condition of being answerable or accountable" or an "[a]bility to meet monetary or *contractual* obligations; esp., the ability to pay what is owed." (Emphasis added.) *Black's* at 1506.

{¶ 17} Contrary to the suggestion of appellant, noticeably absent from the dictionary definition of "legally" is a requirement that in order to be considered "in accordance with the law" an action must be exclusively pursuant to a judgment of a court. Also noticeably absent from the dictionary definition of "responsibility" is a requirement that a quality, state, or condition of being answerable or accountable must be exclusively pursuant to a judgment of a court. The definition of "responsibility" even expressly considers responsibility pursuant to contractual obligations.

{¶ 18} Pursuant to the *Black's Law Dictionary* definitions of "legally" and "responsibility," we conclude that the plain and ordinary meaning of "legally responsible"

---

OHIO UNINSURED AND UNDERINSURED MOTORISTS COVERAGE – BODILY INJURY

For a covered "auto" licensed or principally garaged in, or "auto dealer operations" conducted in, Ohio, this endorsement modifies insurance provided under the following:

* * *

BUSINESS AUTO COVERAGE FORM

* * *

*With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.*

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1A at Sec. D.3)

[5] In *Bertram*, the Supreme Court was interpreting a term used in a statute. However, the Supreme Court, our own court and many appellate courts also look to dictionary definitions when interpreting the plain and ordinary meaning of terms used in contracts. *See, e.g., Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 109 (1995) (applying dictionary definition of term "employee" because it was not defined in an insurance policy); *DN Reynoldsburg, L.L.C. v. Maurices, Inc.*, 10th Dist. No. 20AP-57, 2022-Ohio-949, ¶ 25, fn. 8 ("It is a well-established practice for courts to utilize dictionary definitions to discern the ordinary, everyday meaning of terms employed in contracts.").

as used in the Limitations section of the UIM Endorsement contemplates legal responsibility pursuant to settlement as well as judgment by a court. The CEVA defendants paid $5 million to appellant pursuant to their contractual obligation under the Wrongful Death Settlement and such payment was in accordance with the law. The Wrongful Death Settlement involved the same parties, the Estate of Randell Shank and the CEVA defendants, and the same claim, wrongful death, as the parties and claim in the case before us. Therefore, we conclude the CEVA defendants meet the plain and ordinary meaning of being "legally responsible" as used in the Limitations section of the UIM Endorsement.

**2. Intention of the parties as reflected in the language of the contract as a whole**

{¶ 19} In addition, considering the language of the policy as a whole, we construe the intention of the parties to the Westfield Policy, Westfield and Shank's employer, to be consistent with the plain and ordinary meaning of "legally responsible" as defined by *Black's Law Dictionary*. We conclude the parties intended that the term "legally responsible" as used in the Limitations section of the UIM Endorsement contemplated legal responsibility pursuant to settlement as well as judgment by a court.

{¶ 20} Interpretation of a written contract is a matter of law. *Buckeye Wellness Consultants, L.L.C. v. Hall*, 10th Dist. No. 20AP-380, 2022-Ohio-1602, ¶ 13. " 'In construing the terms of any contract, the principal objective is to determine the intention of the parties.' " *Id.*, quoting *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). " 'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.' " *Id.*, quoting *Kelly v. Med Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). When determining the parties' intent in the language of the contract, a reviewing court must read the contract as a whole and give effect, when possible, to every provision in the agreement. *Clark v. Humes*, 10th Dist. No. 06AP-1202, 2008-Ohio-640, ¶ 12.

{¶ 21} Therefore, we must construe the term "legally responsible" consistent with the intention of the parties as reflected in the language of the contract as a whole. The parties in this case have pointed us narrowly to the language used in specific clauses of the Limitations section of the UIM Endorsement. However, because these clauses and the UIM Endorsement do not expressly define the term "legally responsible," we must look to the

language of the UIM Endorsement and the Business Auto Coverage Form which the UIM Endorsement modifies.

{¶ 22} The Business Auto Coverage Form addresses liability coverage Westfield provides to its insured.  It states in relevant part:

> **SECTION II – COVERED AUTOS LIABILITY COVERAGE**
>
> **A. Coverage**
>
> We will pay all sums an "insured" *legally must pay* as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

(Emphasis added.)  The Form continues to explain Westfield's rights and duties in the event of a "suit."  It states:

> We have the right and duty to defend any "insured" against a *"suit"* asking for such damages. * * * However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" * * * to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Covered Autos Liability Coverage Limit of Insurance has been exhausted by payment of judgments or *settlements*.

(Emphasis added.)   "Suit" is expressly defined as follows:

> **SECTION V – DEFINITIONS**
>
> **N.** "Suit" means a civil proceeding in which:
>
> **1.** Damages because of "bodily injury" or "property damage";
>
> * * *
>
> [T]o which this insurance applies, *are alleged*.
>
> "Suit" includes:
>
> **a.** An arbitration proceeding in which such damages * * * are claimed and to which the "insured" must submit or does submit with our consent; or

> **b.** Any other *alternative dispute resolution* proceeding in which such damages * * * *are claimed* and to which the insured submits with our consent.

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex.1.) Alternative dispute resolution is commonly defined by *Black's Law Dictionary* as "[a]ny procedure for *settling* a dispute by means other than litigation, as by arbitration or mediation." (Emphasis added.) *Black's Law Dictionary* at 95.

{¶ 23} The word "suit" is also used in the UIM Endorsement and because it is not otherwise defined in the UIM Endorsement, the express definition in the Business Auto Coverage Form applies. In the Changes in Conditions section of the UIM Endorsement, the policy adds duties to the insured as follows:

> **E. Changes in Conditions**
>
> The Conditions of the policy for Ohio Uninsured and Underinsured Motorists Insurance are changed as follows:
>
> * * *
>
> **2. Duties in the Event of Accident, Claim, Suit or Loss** in the Business Auto * * * Coverage Form * * * are changed by adding the following:
>
> * * *
>
> **b.** Promptly send us copies of the legal papers if a *"suit"* is brought; and
>
> **c.** A person seeking Underinsured Motorists Coverage must also promptly notify us in writing of a *tentative settlement* between the "insured" and the insurer[6] of an "underinsured motor vehicle * * *."

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1A.)

{¶ 24} Furthermore, there are numerous express references to settlements in the UIM Endorsement. In the Coverage section of the UIM Endorsement, the policy limits coverage of underinsured motorist insurance as follows:

---

[6] We recognize that this reference to "the insurer" is to the insurer of the underinsured motorist, in this case Shackleford. However, we also recognize the reference to settlement as a possible resolution of a suit.

### A. Coverage

* * *

With respect to damages resulting from an "accident" with an "underinsured motor vehicle," we will pay under the coverage selected under this endorsement only if Paragraph **a.** or **b.** below applies:

**a.** The limits of any applicable liability bonds or policies have been exhausted by payment of judgments *or settlements*; or

**b.** A tentative *settlement* has been made between an "insured" and the insurer of the "underinsured motor vehicle" and we:

**(1.)** Have been given prompt written notice of such settlement; and

**(2.)** Advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1A.)

{¶ 25} In the Exclusions section of the UIM Endorsement, the policy excludes coverage as follows:

### C. Exclusions

This insurance does not apply to:

**1.** Any claim *settled* without our consent, if the *settlement* prejudices our right to recover payments. However, this exclusion does not apply to a settlement made with the insurer[7] of an "underinsured motor vehicle" in accordance with the procedure described in Paragraph **A.2.b.**

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1A.)

{¶ 26} Taking into consideration the definition of "suit" and the numerous express references to "settlement" the parties used in both the UIM Endorsement and the Business

---

[7] Again, we recognize that this reference to "the insurer" is to the insurer of the underinsured motorist, in this case Shackleford. However, we also recognize the reference to settlement as possible resolution of a suit.

Auto Coverage Form,[8] we conclude the language of the Westfield Policy as a whole reflects the parties intended that the term "legally responsible" as used in the Limitations section of the UIM Endorsement contemplated legal responsibility pursuant to settlement as well as judgment by a court.

### 3. Construction in favor of the insured is a secondary rule of interpretation

{¶ 27} Appellant also argues that because the phrase "legally responsible" is open to more than one interpretation, it must be construed strictly against the insurer and in favor of the insured. (Appellant's Brief at 11.) The Supreme Court of Ohio, however, instructs

---

[8] In addition to express references to settlement in the UIM Endorsement, the Business Auto Coverage Form also contains many express references to settlement. Section IV regarding Business Auto Conditions states:

**SECTION IV – BUSINESS AUTO CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

* * *

**2. Duties in The Event Of Accident, Claim, Suit or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

* * *

**b.** Additionally, you and any other involved "insured" must:

* * *

**(3)** Cooperate with us in the investigation or *settlement* of the claim or defense against the "suit."

* * *

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Covered Autos Liability Coverage, [1] *we agree in writing* that the "insured" has an obligation to pay[;] or [2] until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

(Emphasis added.) (Westfield's Mot. for Summ. Jgmt., Ex. 1.)

that "[t]he rule that a contract provision should be strictly construed against one party and liberally construed in favor of the other—either due to the type of contract or contract provision at issue, inequality in bargaining power, or the fact that one party is the drafter and the other is not—is a secondary rule." *Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St.3d 387, 2020-Ohio-5101, ¶ 15. The Supreme Court further instructs that the rule "does not come into play unless the intent of the parties cannot be deciphered because the contract language is reasonably susceptible of two different interpretations." *Id.*

{¶ 28} We have already determined that the plain and ordinary meaning of "legally responsible" as used in the Limitations section of the UIM Endorsement contemplates legal responsibility pursuant to settlement as well as judgment by a court and that the language of the Westfield Policy as a whole reflects the parties same intention. Therefore, it is not necessary for us to construe the term strictly against Westfield and in favor of appellant.

### 4. Interpretation of "legally responsible" is consistent with R.C. 3937.18(C)

{¶ 29} The underlying public policy for uninsured and underinsured motorist coverage is to guarantee a minimum level of compensation for an injured person, regardless of whether the other party was insured or uninsured. *Blue Cross & Blue Shield Mut. v. Hrenko*, 72 Ohio St.3d 120, 123 (1995). This court has explained the principles and purposes underlying uninsured and underinsured motorist coverage and the function of set-off provisions:

> The [uninsured and underinsured motorist coverage] carrier does not provide insurance for any specific tortfeasor. The policy only insures that at least a given amount of compensation will be available to the policyholder regardless of whether an insured, underinsured, or uninsured motorist is at fault. The policy is, however, only applicable when an uninsured or underinsured motorist is involved in the accident.
>
> The coverage provides basic protection to the insured in the event of an accident involving an uninsured or underinsured motorist. If this basic protection is available from some other source, the [uninsured and underinsured motorist] coverage does not come into effect. The set-off and subrogation provisions are intended to achieve this objective. *When the insured has received an amount in total compensation equal to the policy's limit of liability, the [uninsured and*

*underinsured motorist coverage] carrier has no further obligation to the insured. \* \* \**

Uninsured motorist policies are concerned only with their insured. The policies do not insure other drivers. They only insure that the policyholder will receive a minimum amount of total compensation regardless of the insurance coverage carried by the other driver.

(Emphasis added.) *Blackburn v. Hamoudi*, 10th Dist. No. 89AP-1102 (Sept. 18, 1990).

{¶ 30} Ohio law expressly provides that uninsured motorist coverage is not excess coverage:

*If* underinsured motorist coverage is included in a policy of insurance, the underinsured motorist coverage *shall* provide protection for insureds thereunder for bodily injury, sickness, or disease, including death, suffered by any insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the underinsured motorist coverage. Underinsured motorist coverage in this state is not and *shall not be* excess coverage to other applicable liability coverages, and *shall only* provide the insured an amount of protection not greater than that which would be available under the insured's uninsured motorist coverage if the person or persons liable to the insured were uninsured at the time of the accident. The policy limits of the underinsured motorist coverage *shall be reduced* by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured.

(Emphasis added.) R.C. 3937.18(C).

{¶ 31} We are cognizant that in this particular case, the language of the Westfield Policy, rather than the default language of R.C. 3937.18 controls. *See Snyder v. Am. Family Ins. Co.*, 114 Ohio St.3d 239, 2007-Ohio-4004, ¶ 13-23 (summarizing history of amendments to R.C. 3937.18). Nevertheless, we find that our interpretation of the term "legally responsible" as used in the UIM Endorsement and Business Auto Coverage Form of the Westfield policy is consistent with R.C. 3937.18(C).

### 5. Case law cited by the parties and relied upon by the trial court not dispositive

{¶ 32} Finally, we note that our interpretation of the term "legally responsible" is limited to and determined pursuant to the Westfield Policy before us. Although helpful to provide an understanding of R.C. 3937.18(C) and a framework for analysis, we do not find any of the cases presented by the parties or relied upon by the trial court to be dispositive.

{¶ 33} Rather, pursuant to the contractual policy terms presented in this case, we find the trial court did not err in concluding the set-off clause contained in the UIM Endorsement of the Westfield Policy applied, and that Westfield was entitled to judgment as a matter of law.

{¶ 34} Accordingly, we overrule appellant's sole assignment of error.

## IV. Conclusion

{¶ 35} For the foregoing reasons, we overrule appellant's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER. J., concurs.
EDELSTEIN, J., dissents.

EDELSTEIN, J., dissenting.

{¶ 36} I agree with the majority that resolution of a lawsuit by settlement is generally encompassed within the term "legal responsibility" as used in the Westfield Policy. And so, I agree a jury need not resolve all questions of "legal responsibility." However, I read the provision we are charged with interpreting in this case as linking "legal responsibility" to "bodily injury." And so, as I see it, the ultimate question in this case is not whether there is a genuine dispute of material fact regarding the CEVA defendants' legal responsibility generally. That question can be answered easily by the evidence proving the CEVA defendants settled with appellant for $5,000,000. Rather, we must determine whether there is a genuine dispute of material fact regarding their legal responsibility for the accident that caused Mr. Shank's bodily injuries and ultimately his death. Because I do not believe the fact of the CEVA defendants' settlement for $5,000,000, alone, answers that question, I would vacate the trial court's judgment so that a jury can make that determination.

{¶ 37} The UIM Endorsement states, in relevant part, "With respect to coverage provided for damages resulting from an 'accident' with an 'underinsured motor vehicle,' the limit of insurance shall be reduced by all sums paid for '***bodily injury***' by or on behalf of anyone who is legally responsible." (Emphasis added.) (Feb. 11, 2022 Westfield Ins. Co. Mot. for Summ. Jgmt. at 3.) Again, I agree that a party could generally become legally responsible through a settlement agreement. But, as even the provisions cited by the majority seem to reveal, "legal responsibility" is linked throughout the Westfield Policy to specific, identified injury. For example, SECTION II – COVERED AUTOS LIABILITY COVERAGE and SECTION V – DEFINITIONS refer to payment of "damages because of 'bodily injury' or 'property damage.' " The UIM Endorsement, on the other hand, specifically contemplates payment of sums for "bodily injury" only.

{¶ 38} The language of the UIM Endorsement seems to require a set-off only when a party legally responsible for ***bodily injury*** arising from an accident pays a sum of money to the insured—not when a party elects to pay some amount, whether responsible for bodily injury or not. By agreeing to settle in exchange for dismissal from the case, the CEVA defendants accepted legal responsibility for fulfilling the terms of a contract (e.g., paying the amount agreed to), not necessarily for causing the accident and the resulting bodily injury.

{¶ 39} Under an interpretation of "legal responsibility" linked to bodily injury, the trial court would have had to consider whether the CEVA defendants were legally responsible for the bodily injury in this case. Therefore, the reason for the settlement becomes the relevant question. Certainly, a settlement agreement could include an admission of liability for bodily injury. But in the absence of such an admission, the trial court in this case granted summary judgment in reliance on the allegations in the complaint, the fact of the settlement, the amount of the settlement, and the court's own speculation about the CEVA defendants' interests in settlement. This is what I believe was improper at this stage in the proceedings.

{¶ 40} Defendants settle cases—even expensive ones—for many compelling reasons. They settle to eliminate risk. Juries are unpredictable.[9]  Jurors might get confused.  They might prefer the plaintiff's lawyer over the defendant's lawyer.  Perhaps a key witness is unavailable for trial and the court refuses to continue the trial date.  Perhaps, although a party is not legally responsible, their primary witness is not expected to perform well at trial.  Perhaps the defendant realizes their lawyer is good at defending cases up until trial but is not a great trial lawyer.  Maybe trial will take three weeks and the defendant does not want to spend that time in a windowless courtroom racking up attorney fees.  Perhaps the defendant trucking company sees that high-dollar jury verdicts in trucking accident cases have skyrocketed in recent years.[10]

{¶ 41} A defendant trucking company might settle to avoid a public determination of liability.  Or such a defendant might settle for the policy limit to avoid a judgment in an amount greater than their insurance coverage.  Mr. Shank died from the injuries he sustained in this accident.  The damages he and his estate suffered could very well have exceeded the CEVA defendants' $5,000,000 policy limit, leaving them on the hook for payments above and beyond that amount.  Perhaps the CEVA defendants entered a settlement to avoid that risk, even knowing they were not legally responsible for Mr. Shank's death.

{¶ 42} Of course, this is only speculation about why the CEVA defendants chose to settle the case in exchange for the dismissal of the action with prejudice.  But that is exactly the point—parties enter settlement agreements for any number of reasons.  Without a formal admission of liability, we are left to speculate about their reasons for settling, including whether it is because they are, in fact, legally responsible for the accident that caused Mr. Shank's bodily injuries and his ultimate death.  Because the fact of the

---

[9] *See, e.g.*, Robert J. Rhee, *A Price Theory of Legal Bargaining: An Inquiry Into the Selection of Settlement and Litigation Under Uncertainty*, 56 Emory L.J. 619, 649-50 (2006); Jordan Rothman, *Why Many Cases Settle Right Before Trial*, Above the Law, Oct. 20, 2023, https://abovethelaw.com/2023/10/why-many-cases-settle-right-before-trial/ (accessed Sept. 9, 2024).

[10] *See, e.g.*, Contessa Brewer and Katie Young, *Rise in "nuclear verdicts" in lawsuits threatens trucking industry*, CNBC, Mar. 4, 2021, https://www.cnbc.com/2021/03/24/rise-in-nuclear-verdicts-in-lawsuits-threatens-trucking-industry.html (accessed Sept. 9, 2024); *Nuclear Verdicts: Trends, Causes, and Solutions*, U.S. Chamber of Commerce Institute for Legal Reform, Sept. 2022, available at https://instituteforlegalreform.com/wp-content/uploads/2022/09/NuclearVerdicts_RGB_FINAL.pdf (accessed Sept. 9, 2024).

$5,000,000 settlement does not resolve the legal responsibility question without speculation, I believe it must be answered by a finder of fact at trial.

{¶ 43} For these reasons, I believe a genuine dispute of material fact remains regarding whether the CEVA defendants are legally responsible as that term is used in the Westfield Policy.  Because I would sustain appellant's assignment of error and reverse the trial court's judgment granting summary judgment, I respectfully dissent.

_____